## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MICHAEL SHTAIF,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **JOHN HOWARD, STANTON,** | § | **JURY DEMAND** |
| **DEFREITAS, DAVID WATSON,** | § | |
| **MICHAEL MANCINI, ROGER SHOSS,** | § | |
| **GLACIER MINTS HOLDINGS, INC.,** | § | |
| **TBP CONSULTING CORP.,** | § | |
| **I.M. TRADING CORP., BBI CORP. AND** | § | |
| **JOHN DOES 1 THROUGH 10** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

Plaintiff, Michael Shtaif ("Shtaif" or "Plaintiff"), by and through his attorneys, Gusrae,

Kaplan, Bruno & Nusbaum PLLC, complaining of the defendants, John Howard ("Howard"),

Stanton DeFreitas ("DeFreitas"), David Watson ("Watson"), Michael Mancini ("Mancini"),

Roger Shoss ("Shoss"), Glacier Mints Holdings, Inc., TBP Consulting Corp., I.M. Trading Corp.,

BBI Corp. and John Does 1 through 10 (collectively "Defendants"), alleges[1]:

### Preliminary Statement

1.     The Plaintiff has brought this suit seeking damages in connection with a business

transaction, *i.e.*, the investment of Plaintiff's personal funds, goods and services in Defendants'

development stage purportedly publicly traded "shell" corporation, Magellan Energy, Ltd.

---

[1] All allegations are made upon the Plaintiff's personal knowledge and a review of various books and records. That which is not based upon personal knowledge is alleged upon information and belief. All allegations made herein against the defendants collectively are also made against John Does 1 through 10.

(formerly known as the Eastwind Group, Inc., hereinafter "MEL" or the "Company"), a business transaction into which Plaintiff was fraudulently induced to enter.

2.    The Defendants presented themselves to the Plaintiff as legitimate businessmen, ostensibly seeking legitimate global financial opportunities in oil and gas exploration and production.

3.    In truth however, Defendants are securities law violators whose business activities, by themselves and with the aid of their co-conspirators and nominees, falsely created MEL as a viable public entity, when in fact it was created as a means to circumvent and violate, amongst other violations, the provisions of the federal securities laws.

4.    A company named The Eastwind Group, Inc. ("the Original Eastwind") was formed in the 1990s and is and was defunct at all relevant times herein.  After a Bankruptcy Court declared the Original Eastwind defunct, Defendants and their co-conspirators formed a new company named Eastwind Group, Inc. ("Eastwind").  Through a series of artifices and devices including the misrepresentation of MEL as the Original Eastwind; Defendants and their co-conspirators created a public company without compliance with the Federal Securities Laws. In or about November 2005, Defendants touted Plaintiff Shtaif, an unwary businessman and potential investor, as to the publicly traded status of MEL and their proposed oil and gas activities.

5.    However, as explained further below, everything that Defendants represented to Shtaif about MEL's status as a public company, its purpose, its business plan, its future and *its very identity were false*.

6.    MEL was created solely as a device to facilitate Defendants' scheme to commit fraud in that, amongst other things, Defendants violated the registration requirements of the '33 Act when they "created" and transferred to themselves 4 million "freely tradable" shares of MEL.

Defendants also defrauded the Plaintiff and the investing public through a "pump and dump" scheme by selling unregistered shares of MEL into the public market in violation of the '33 Act and the Exchange Act.

7.      Defendants induced Shtaif to invest in MEL.   Plaintiff received 18 million restricted shares of MEL common stock. As part of the investment plan, the Plaintiff was named as CEO of MEL.  Notwithstanding such status as CEO, the Defendants continued to direct the affairs of the Company just as they had before Shtaif became president and CEO.

8.      Defendants, as issuers, underwriters and promoters of MEL, had no authority to issue any "freely" tradable stock without the approval of MEL's board of directors *and* without filing the appropriate registration statement pursuant to the '33 Act and by obtaining SEC approval thereof.

9.      However, without Shtaif's consent, the Defendants, with the aid of their co-conspirators and nominees, including their corporate counsel, Defendant Shoss, instructed the Company's transfer agent to issue 4 million shares of MEL to four  Defendant Texas corporations, all of which were owned and/or controlled by the Defendants, under the auspices of a purported "Texas 504D exemption" to the '33 Act registration requirements (the "False Exemption").

10.     Contemporaneously, the Defendants directed actions designed to artificially manipulate the supply and demand for the publicly traded shares of MEL in order to artificially affect the price and trading volume of MEL stock (commonly referred to as the "**Pump**").  The artifices used by the Defendants included, but were not limited to, issuing false "hyping" press releases for business deals that were never intended to be completed. Once the stock volume and price had been artificially inflated by the Defendants and their co-conspirators, the Defendants, through their co-conspirators and nominees, sold their stock to the unsuspecting public

(commonly referred to as the "**Dump**"), reaping substantial and illicit profits in violation of the federal securities laws.

11.     Defendants' wrongful conduct requires that the Plaintiff's MEL purchase be rescinded. Plaintiff seeks the return of his investment, and compensation for the lost business opportunities and compensation for damage to his professional reputation.

## The Parties

12.     Shtaif is a natural person who resides in Canada.  Shtaif purchased 18 million restricted shares of MEL.  Shtaif is and was prior to the MEL transaction described herein, in the oil and gas production and exploration business.  Shtaif is the victim of the Defendants' multiple securities laws violations and other wrongful conduct.

13.     Howard is a natural person who, upon information and belief, resides in Texas.  Howard, along with other Defendants herein own and/or control International Energy, Ltd. formerly BDW Holding, Ltd. (hereinafter "BDW"), Transworld Oil & Gas, Ltd. formerly Alaska Oil & Gas, Ltd., Glacier Mints Holdings, Inc., TBP Corp., I.M. Trading Corp., BBI Corp., Aberdeen Online Trading, Ltd. ("Aberdeen"), Aberdeen Trust AG, and other domestic and offshore entities used to effectuate Defendants' "pump and dump" schemes to realize illicit profits by defrauding the public in violation of federal securities laws and regulations. Howard is a co-conspirator in the scheme to defraud the Plaintiff and acted in concert and/or as a joint venturer with other Defendants in connection with the securities fraud, breach of contract and fraudulent inducement that are complained of herein.

14.     DeFreitas is a natural person who, upon information and belief, resides in Texas. DeFreitas, along with other Defendants herein, own and/or control BDW, Transworld Oil & Gas, Ltd. formerly Alaska Oil & Gas, Ltd., Glacier Mints Holdings, Inc., TBP Corp., I.M. Trading

Corp., BBI Corp, Aberdeen, Aberdeen Trust AG, and other domestic and offshore entities used to effectuate Defendants' "pump and dump" schemes to realize illicit profits by defrauding the public in violation of federal securities laws and regulations. DeFreitas is a co-conspirator in the scheme to defraud the Plaintiff and acted in concert and/or as a joint venturer with other Defendants in connection with the securities fraud, breach of contract and fraudulent inducement that are complained of herein.

15.    Watson is a natural person who, upon information and belief, resides in Florida. Watson who, along with other Defendants herein, own and/or control BDW, Transworld Oil & Gas, Ltd. formerly Alaska Oil & Gas, Ltd., Glacier Mints Holdings, Inc., TBP Corp., I.M. Trading Corp., BBI Corp, Aberdeen, Aberdeen Trust AG, and other domestic and offshore entities used to effectuate Defendants' "pump and dump" schemes to realize illicit profits by defrauding the public in violation of federal securities laws and regulations. Watson is a co-conspirator in the scheme to defraud the Plaintiff and acted in concert and/or as a joint venturer with other Defendants in connection with the securities fraud, breach of contract and fraudulent inducement that are complained of herein.

16.    Mancini is a natural person who, upon information and belief, resides in Texas. Mancini who, along with other Defendants herein, own and/or control BDW, Transworld Oil & Gas, Ltd. formerly Alaska Oil & Gas, Ltd., Glacier Mints Holdings, Inc., TBP Corp., I.M. Trading Corp., BBI Corp, Aberdeen, Aberdeen Trust AG, and other domestic and offshore entities used to effectuate Defendants' "pump and dump" schemes to realize illicit profits by defrauding the public in violation of federal securities laws and regulations. Mancini is a co-conspirator in the scheme to defraud the Plaintiff and acted in concert and/or as a joint venturer with other

Defendants in connection with the securities fraud, breach of contract and fraudulent inducement that are complained of herein.

17.    Shoss is a natural person who, upon information and belief, resides and practices law in Houston, Texas. Shoss served as corporate counsel and issued the legal opinion which created the False Exemption (as defined below). Shoss may be served with process at 807 S. Post Oak, Suite 223, Houston, Texas 77056.

18.    Shoss has sold shares he received as a result of his participation in the fraud that was perpetrated on Plaintiff by Defendants and their co-conspirators.

19.    Glacier Mints Holdings, Inc. is a Texas corporation owned and/or controlled by the individual Defendants named herein, and/or their nominees and co-conspirators. Process may be served on Glacier Mints Holdings, Inc's registered agent, Roger Shoss at 807 S. Post Oak Lane #223, Houston, Texas 77056.

20.    TBP Consulting Corp. is a Texas corporation owned and/or controlled by the individual Defendants named herein, and/or their nominees and co-conspirators. Process may be served on TBP Consulting Corp.'s registered agent, Roger Shoss at 807 S. Post Oak Lane #223, Houston, Texas 77056.

21.    I.M. Trading Corp. is a Texas corporation owned and/or controlled by the individual Defendants named herein, and or their nominees and co-conspirators. Process may be served on I.M. Trading Corp.'s registered agent, Roger Shoss at 807 S. Post Oak Lane #223, Houston, Texas 77056.

22.    BBI Corp. is a Texas corporation owned and/or controlled by the individual Defendants named herein, and/or their nominees and co-conspirators. Process may be served on BBI Corp.'s registered agent, Roger Shoss at 807 S. Post Oak Lane #223, Houston, Texas 77056.

23.    John Does 1 through 10 are natural persons whose identities are as yet unknown to the Plaintiff. John Does 1 through 10 have participated in the Defendants' nefarious wrongful and illegal conduct.

## Jurisdiction and Venue

24.    This Court maintains original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, in that the subject matter of this suit arises from the laws of the United States. Specifically, the laws at issue are Section 5 of the Securities Act of 1933 (the "'33 Act"), 15 U.S.C.A. §77e, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C.A. §78j(b), (Section "10(b)"), Rules 10b-5, 17 C.F.R. 240.10b-5, 240.10b-5(collectively Rule "10b-5").

25.    Venue is proper here under 28 U.S.C. § 1391(b) and (c), in that the Defendants executed their fraudulent scheme within and without Houston, Texas.

## The Facts Giving Rise to This Action

### The Purchase

26.    In or around late 2005, Shtaif determined to develop an oil and gas exploration and production business.

27.    Shtaif intended to capitalize this new company using his personal funds as well as monies from other investors, including Midland Resources Limited ("Midland"), a company that was willing to make a large investment in oil and gas exploration and production.

28.    Thereafter, in or about November 2005, Shtaif met the individuals.

29.    Thereafter, Defendants made various representations to Shtaif, touting MEL as a growing, publicly traded development stage corporation with a solid reputation that intended to

engage in the very same business as Shtaif intended, to wit: oil and gas exploration and production.

30.     The Defendants' presentation to Shtaif was replete with falsehoods regarding MEL's intention to engage in the oil and gas exploration and production business. Contrary to their representations, the Defendants never intended to actually conduct a viable business, as is set forth more fully below.

31.     As a result of Defendants' false representations Plaintiff invested in MEL rather than form his own new business entity.

32.     The purchase transaction ("Purchase") into which Shtaif entered with Defendants included Shtaif's investment of $2 million in money, goods and services, in exchange for his being issued 18 million restricted shares of MEL stock and the title of President CEO ("CEO").

33.     Shtaif subsequently learned that his title of CEO was inaccurate, as the Defendants at all times maintained control over various aspects of the Company.

34.     As part of the Purchase, Shtaif represented that he would solicit other investors to invest in MEL. In accordance with his representation Shtaif introduced Midland to the Defendants. Midland ultimately invested approximately $50 million into MEL.

35.     At the time of the Purchase, Defendants represented that they would also invest in MEL. Such representation was false and was among the various misrepresentations and omissions, as set forth below which were made to Shtaif by or on behalf of the Defendants as part of the Defendants fraudulent scheme.

**The Midland Deal**

36.     After Plaintiff introduced Defendants and MEL to Midland, Defendants made substantially the same misrepresentations to Midland as they had to Shtaif. As a result, and in

reliance upon the Defendants' misstatements and omissions, in or about February 2006, Midland invested approximately $50 million in MEL in exchange for 25 million restricted shares of MEL stock. (the "Midland Deal")

37.     Midland, like Shtaif, believed and relied on the Defendants' misrepresentations.[2]

## Defendants' Control over MEL and the Improper Issuances of 4 Million "Free Trading" Shares of MEL

38.     Defendant Howard drafted MEL press releases and determined what and when information was released to the public. (**Exhibit "A,"** 2 E-mails dated February 1, 2006 and February 27, 2006)

39.     Defendants also determined when and how they would introduce there freely tradable shares into the marketplace, in order to manipulate the MEL market. (**Exhibit "B,"** E-mail dated December 1, 2005 and 2 E-mails dated January 30, 2006)

40.     Defendants' control of the Company allowed them to manipulate events and complete a purported 504D offering, *i.e.*, the False Exemption, that wrongfully provided them with 4 million freely tradable shares to redistribute in the marketplace at a time when there was only a tiny public float in MEL.

41.     Howard presented the issuance of 4 million shares to Shtaif as a fait accompli, claiming that the 504D offering was approved by MEL's previous Board, thereby claiming there was no need to obtain Shtaif's or the current Board's approval or direction. (**Exhibit "C,"** E-mails dated January 28, 2006 and **Exhibit "A-2"**)

42.     On or about January 23, 2006, Shoss, MEL's corporate counsel, chosen by the Defendants, instructed the Company's transfer agent to issue 1 million freely tradable shares to each of the four (4) Defendant Texas corporations that were, unbeknownst to Shtaif, upon

---

[2] On or about June 21, 2006, the Midland Deal was rescinded and Midland's monies returned.

information and belief owned and/or controlled by the Defendants, *i.e.*, Glacier Mints Holdings, Inc., TBP Corp., I.M. Trading Corp., BBI Corp. (the "Texas Companies"). Shoss instructed that this distribution be made pursuant to a nonexistent exemption provided in Rule 504, Regulation D, *i.e.*, the False Exemption.

43.     Shoss received shares of "freely tradable" MEL stock as a result of the False Exemption.

44.     Having intentionally and wrongfully relied upon a nonexistent exemption to the '33 Act's registration requirements, the Defendants, their co-conspirators and nominees effectively created and took for themselves 4 million free trading shares of MEL which upon information and belief they have, in whole or in part, fraudulently distributed into the public market.

**The MEL Pump**

45.     Contemporaneously with the completion of the False Exemption, Defendants, through press releases and otherwise, promoted MEL in order to make it appear that the Company was "on the verge of greatness" in the energy exploration and production arena.

46.     For example the Defendants, on behalf of MEL, issued press releases in March and April 2006 indicating that MEL was completing a multimillion dollar deal with BDW (the "BDW Deal"), a company owned and/or controlled by the Defendants, a fact that was not disclosed and accordingly was unbeknownst to the public. The BDW Deal was a sham.

47.     There were purported discussions and draft agreements between MEL and BDW in December 2005. The Defendants, through BDW, purportedly intended to invest approximately $70 million dollars into MEL in exchange for a 25% interest in the Company; $8 million was due upon closing.

48.     However, BDW never invested in MEL, nor have any of the Defendants, as some Defendants represented, invested as they represented they would.

49. The BDW Deal was part of the Defendants' scheme to pump up the value of MEL's stock through the announcement of bogus transactions, intended to pump up MEL's price, while the Defendants and their co-conspirators were upon information and belief preparing to distribute to the public, in whole or in part, the wrongfully acquired 4 million freely tradable MEL shares.

50. By issuing the 4 million shares, the Defendants caused the "public" float of MEL to suddenly increase one thousand fold. Through the Defendants' "pumping" scheme the stock price of MEL rose significantly in or around March 2006.

**The MEL Dump**

51. Upon information and belief, once the 4 million shares were issued to the controlled Texas Companies, Defendants, through their co-conspirators and nominees sold numerous shares of MEL to the unsuspecting public utilizing, among other Defendant-controlled entities, Aberdeen, as a vehicle to effectuate the sales.

52. The Defendants' 4 million shares of MEL, if validly issued, which Plaintiff does not concede, were "underwriter" shares, which did not properly meet the requirements of the '33 Act for public trading.

**Defendants' Identity Theft**

53. In or around 1993 the Original Eastwind was formed as a Delaware corporation, as an investment holding company. As Original Eastwind, it formerly traded on the OTC Market. The Original Eastwind was subsequently delisted, its charter was voided by the State of Delaware for failure to pay franchise taxes and its demise was so-ordered by a Bankruptcy Court's approval of a plan of liquidation that required the Original Eastwind's demise.

54.     Subsequent thereto, Eastwind, a new Delaware corporation, changed its name to MEL. This company, controlled by the Defendants, was a new company unaffiliated with the Original Eastwind.

55.     However, upon information and belief, the Defendants, as part of their fraudulent conspiracy, advised the CUSIP Service Bureau ("CSB") that MEL was in fact the same entity as Original Eastwind.  By lying to the CSB, the Defendants obtained the same CUSIP number as the Original Eastwind.

56.     The purpose of forming Eastwind – now MEL – in this manner was to intentionally and falsely represent that MEL was the Original Eastwind, thereby deluding and defrauding Shtaif and other investors, including public investors, into believing that MEL was a viable, longstanding and legitimate *publicly traded* entity.

57.     Defendants failed to disclose to Shtaif, Midland and the investing public at large the identity theft they perpetuated on the Plaintiff and the unsuspecting public.

### Shtaif and Midland Realize the Defendants' Fraud

58.     By in or about May 2006, both Shtaif and Midland realized that:

- The Defendants never intended to invest in MEL to assist in its growth;

- The Defendants' hyping and touting MEL and its growth potential in oil and gas exploration and production was intended to facilitate the wrongful sale by the Defendants of their shares of MEL;

- The Defendants intentionally misrepresented their designs for MEL in order to induce Plaintiff and Midland to invest in the Company;

- The Defendants intentionally incorporated MEL with the intent of stealing the identification of the Original Eastwind;

- The Defendants misrepresented their designs for MEL in order to induce Shtaif, Midland and others to invest in the Company;

- The BDW Deal was a sham and the BDW announcement was part of the Defendants' pump and dump scheme; and

- The Defendants had no legal right to create the 4 million freely tradable shares pursuant to the False Exemption which enabled the Defendants and their co-conspirators fraud.

59.     As a result of these realizations, Midland has sought to and has rescinded its investment in MEL.

60.     Shtaif was fraudulently induced to invest in MEL.  He was also fraudulently induced to introduce investors into MEL.  Shtaif is stuck with 18 million virtually worthless shares of MEL. Shtaif also lost multiple business opportunities and has had his professional reputation damaged.

## Defendants Have Previously Violated the Federal Securities Laws and Engaged in Pump and Dump Schemes Before

61.     The defrauding of Shtaif was not the first time that the Defendants had used a purported exemption to issue freely tradable shares as had been done by Defendants using the False Exemption to illegally acquire freely tradable shares of a public shell in order to effectuate a pump and dump scheme and to improperly sell bogus shares into the public market.

62.     Upon information and belief, Transworld Oil & Gas, Ltd. formerly Alaska Oil & Gas, Ltd. ("Alaska"), is a company controlled by one or more of the Defendants.

63.     By the Defendants' own admission they had previously acquired freely tradable stock from Alaska's transfer agent, which shares were illegally designated and were, upon information and belief, distributed to the Texas Companies for wrongful redistribution to the public. (**Exhibit "D,"** 2 Shoss letters dated January 23, 2006)

## Defendants at all Times Knew Their Conduct was Fraudulent

64.     The Defendants knew or should have known that they were "underwriters" as that term is defined under the '33 Act and that:

- There is no Rule 504 or other exemption to the registration requirements under the '33 Act;

- The 4 million shares illicitly acquired in freely tradable form required registration under the '33 Act;

- It was illegal to make the numerous fraudulent misrepresentations and omissions to Shtaif, Midland and the investing public with regard to MEL's state of affairs; and

- It was illegal to falsely manipulate the price and volume of MEL in order to reap illicit profits by selling the unregistered shares acquired in connection with the False Exemption.

65.     The Defendants in fact did know and *did admit* to Shtaif, albeit too late, that they were artificially controlling the price of MEL. As DeFreitas wrote, "Aberdeen clients have expended in excess of US $40,000 of their own funds to preserve the 'artificial' value of shares in MEL…"

**(Exhibit "E,"** E-mail dated May 26, 2006)

66.     Defendants' control over the Company's stock and their intentions regarding the distribution thereof should have been disclosed in a registration statement under the '33 Act, thereby putting public investors "on notice" of such control.

67.     Had Shtaif understood the Defendants' true intentions with regard to MEL, and had the 4 million shares that the Defendants stole been properly registered, Shtaif and the investing public at large would have learned such material facts as:

- A plan of distribution regarding the selling shareholders' disposition of their securities;

- Information regarding any selling security holders including, *inter alia*, if security holders of a small business issuer are offering securities, the name of each selling security holder, any position, office, or other material relationship which the selling security holder has had within the past three years with the small business issuer or any of its predecessors or affiliates, the amount of securities of the class owned by such security holder before the offering, the amount to be offered for the security holder's account, the amount and (if one percent or more) the percentage of the class to be owned by such security holder after the offering is complete;

- Identification of and legal opinion from the company's legal counsel, including, but not limited to, *the company's securities owned by such legal counsel*;

- *Identification of directors, officers, promoters and control persons (including control over nominees)*;

- Information regarding the determination of the offering price including, *inter alia,* if there is no established public market for the common equity being registered or if there is a significant difference between the offering price and the market price of the stock, the factors that were considered in determining the offering price;

- Information regarding how the net proceeds of the offering will be used, indicating the amount to be used for each purpose and the priority of each purpose, if all of the securities are not sold; and

- Information regarding the determination of pricing of the shares of stock.

68.    Armed with this knowledge, Shtaif would never have introduced Midland to the Defendants and would have sought rescission of the Purchase – or refused the Purchase altogether depending upon the time frame of registration of the stock – long before he suffered lost business opportunities and damage to his reputation, not to mention the loss of the $2 million in cash, goods and services he invested in MEL.

## COUNT ONE
### (Violations of the Antifraud Provisions of § 10(b) of the '34 Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5])

69.    Plaintiff repeats and realleges each and every allegation contained in the Complaint as if set forth at length herein.

70.    Section 10(b) of the '34 Act (15 U.S.C. § 78j(b)) makes it unlawful:

> [t]o use or employ, in connection with the purchase and sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

71.    Rule 10b-5 promulgated by the SEC under Section 10(b) (17 C.F.R. § 240.10b-5) makes it unlawful for any person:

     (a)    to employ any device, scheme, or artifice to defraud;

     (b)    to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

     (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

72.    Defendants and their co-conspirators and nominees intentionally made material misstatements of facts to Shtaif in order to induce him to purchase 18,000,000 restricted shares of MEL and to further induce him to bring in other investors to MEL who Defendants also defrauded in the course of their unlawful pump and dump scheme.

73.    Defendants and their co-conspirators and nominees intentionally omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Shtaif in order to induce him to invest in MEL and to bring in other investors who were also defrauded in the course of Defendants' unlawful scheme.

74.    Shtaif was damaged by such fraud in an amount to be determined at trial, but in any event, not less than $2 million, the purchase price of the 18,000,000 restricted shares.

75.    Amongst the misstatements and omissions of material fact were:

- Defendants had no intention of running MEL as a viable business concern;
- Defendants' misrepresentations with regard to their intentions for MEL's future ( or more accurately the lack thereof) to Shtaif were made to induce Shtaif to invest in MEL;
- The Defendants intentionally incorporated MEL under a previous name that was substantially similar to a defunct corporation as a fraudulent ruse to attract investors such as Shtaif and Midland, and the investing public;
- Defendants misrepresentations to Shtaif were made to induce Shtaif to introduce investors to the Company;
- Defendants at all times intended to and did maintain effective control over MEL;

- Defendants created 4 million shares of MEL which they failed to register pursuant to the registration requirements of the '33 Act and did not disclose to Plaintiff or others their use of the False Exemption and the identification theft of a once public, now defunct company;

- Defendants promotion of MEL was to facilitate their wrongful selling of unregistered shares of MEL into the public marketplace;

- Defendants sold their wrongfully obtained "freely tradable" shares into the marketplace through 4 corporations that they jointly and/or severally controlled;

- Defendants issued "freely tradable" shares of MEL to Defendant Shoss, who sold some or all of those shares;

- Defendants were "underwriters" as defined under the '33 Act;

- Defendants were "promoters" as defined under the '33 Act;

- Defendants were issuers as defined under the '33 Act;

- The 4 million MEL shares that Defendants created for sale to the investing public were underwriter shares; and

- Defendants conduct violated Section 5 of the '33 Act[3].

76.     Shtaif did reasonably rely to his detriment on the foregoing misrepresentations and omissions.

77.     Due to the Defendants' conduct, Shtaif seeks rescission of his purchase of 18,000,000 restricted shares of MEL for $2 million.

78.     Due to the Defendants' conduct, Shtaif suffered consequential damages in an amount to be determined at trial including, but not limited to, reasonable attorneys' fees, lost business opportunity, adverse impact upon his business reputation, and costs and disbursements.

---

[3] Section 5c states that

I[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 8.

## COUNT TWO
### (Common Law Fraud)

79.     Plaintiff repeats and realleges each and every allegation contained in the Complaint as if set forth at length herein.

80.     Defendants Howard, DeFreitas, Watson and Mancini, and their co-conspirators and nominees including John Does 1 through 10, fraudulently induced the Plaintiff to enter into the Purchase.

81.     Defendants continued their fraud by intentionally promoting bogus business transactions such as the BDW Deal in order to induce Shtaif to enter into the Purchase, which included his introduction of other investors to the Defendants and MEL, such as Midland.

82.     Plaintiff relied upon the misrepresentations and omissions made by Defendants, to his detriment and was damaged thereby.

83.     Due to the Defendants' conduct, Shtaif suffered damages in the amount of 2 million dollars and consequential damages in an amount to be determined at trial including, but not limited to, reasonable attorneys' fees, lost business opportunity, adverse impact upon his business reputation, and costs and disbursements.

## COUNT THREE
### (Breach of Contract)

84.     Plaintiff repeats and realleges each and every allegation contained in the Complaint as if set forth at length herein.

85.     The Defendants and their co-conspirators made direct and intentional representations to Shtaif in connection with the Purchase, that MEL was a public company.

86.     Defendants breached their agreement with Plaintiff as MEL was not a public company, thereby causing damage to Plaintiff in the amount of 2 million dollars and consequential

damages in an amount to be determined at trial including, but not limited to, reasonable attorneys' fees, lost business opportunity, adverse impact upon his business reputation, and costs and disbursements.

WHEREFORE, the Plaintiff respectfully requests that a judgment be entered in his favor and against the Defendants on the foregoing causes of action, in an amount no less than $2 million, together with punitive damages to be determined at trial as a result of the egregiousness of the Defendants' behavior in an amount equal to treble compensatory damages, together with costs and reasonable expenses, including attorneys' fees, along with such other and further relief the Court deems just and proper.

Dated July 11, 2006

Respectfully submitted,

By: Mary Lou Flynn-DuPart
    Mary Lou Flynn-DuPart
    SBN: 07199700, SDN No. 1629
    Jennifer Bryant
    SBN 03276600, SDN No. 1286
    JACKSON WALKER L.L.P.
    1401 McKinney, Suite 1600
    Houston  Texas  77010
    (713) 752-4200
    (712) 752-4221(Telecopier)

    Alan N. Greenspan
    SBN 08402975
    JACKSON WALKER L.L.P.
    901 Main Street
    Dallas, Texas 75202
    Tele.: (214) 953-5912
    Fax:  (214) 953-5822

    ATTORNEYS FOR PLAINTIFF
    MICHAEL SHTAIF

*Of Counsel for the Plaintiff*
Martin H. Kaplan (MK6258 )
GUSRAE, KAPLAN, BRUNO &
NUSBAUM PLLC
120 Wall Street
New York, NY 10005
212-269-1400